**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES M. READ,<br><br>*Plaintiff*,<br><br>v.<br><br>COUNCIL OF THE INSPECTORS GENERAL ON INTEGRITY AND EFFICIENCY et al.,<br><br>*Defendants*. | Civil Action No. 24-1808 (TJK) |

## MEMORANDUM OPINION

The Council of the Inspectors General on Integrity and Efficiency, or CIGIE, is an independent entity within the Executive Branch tasked with addressing integrity and efficiency issues across agencies and increasing the professionalism in the offices of Inspectors General. For several years, CIGIE's Integrity Committee looked into misconduct allegations against James M. Read, who is employed by an Inspector General. In response, Read sued CIGIE, its Integrity Committee, and several related officials, alleging that their activity was unlawful for several reasons, including because the Chairperson of the Integrity Committee was unconstitutionally exercising Executive Branch power. Defendants moved to dismiss, arguing that the Court lacked subject matter jurisdiction over Read's constitutional claim, and that he has otherwise failed to state a claim. Since then, the Integrity Committee closed its inquiries and Read has neither suffered nor been threatened with any disciplinary or other adverse action. And the Chairperson who was the focus of Read's constitutional claim is no longer in that position. For the reasons explained below, the Court will grant Defendants' motion and dismiss the case because it agrees it lacks jurisdiction over Read's constitutional claim, and because Read has otherwise failed to state a claim.

## I. Background

### A. CIGIE and its Integrity Committee

To "prevent and detect fraud and abuse in [federal] programs and operations," Congress established the offices of the several Inspectors General at federal agencies. 5 U.S.C. §§ 402, 415(b). These watchdog offices are designed, among other things, "to conduct and supervise audits and investigations relating to [such] programs and operations" in federal agencies and other "designated Federal entit[ies]. *Id.* §§ 402(b)(1), 415(b).

To coordinate actions across the various Inspector General offices, Congress created CIGIE. 5 U.S.C. § 424. CIGIE is "an independent entity within the executive branch" whose "mission" is to "address integrity, economy, and effectiveness issues that transcend individual Government agencies" and "increase the professionalism and effectiveness of personnel . . . in the offices of the Inspectors General." *Id.* § 424(a)(2). Its members include all the Inspectors General in offices created by 5 U.S.C. §§ 402 and 415. *Id.* § 424(b)(1)(A). By statute, the "Deputy Director for Management of the Office of Management and Budget shall be the Executive Chairperson of the Council." *Id.* § 424(b)(2)(A). CIGIE also elects one of its members to serve as the non-Executive "Chairperson of the Council." *Id.* § 424(b)(2)(B).

Within CIGIE, Congress also created its Integrity Committee. 5 U.S.C. § 424(d)(1). The Integrity Committee watches the watchers by "receiv[ing], review[ing], and refer[ing] for investigation allegations of wrongdoing that are made against Inspectors General and staff members of the various Offices of Inspector General." *Id.* The Integrity Committee has six members. *Id.* § 424(d)(2)(A). Two are fixed: "[t]he official of the Federal Bureau of Investigation [who is] serving on the Council" at the time and the "Director of the Office of Government Ethics or the designee of the Director." *Id.* §§ 424(d)(2)(A)(i), (iii). The other four are selected from CIGIE's membership by the Chairperson of the Council. *Id.* § 424(d)(2)(A)(ii). And those six elect one of

their own to serve as Chairperson of the Integrity Committee.

### B. Factual and Procedural Background

Read alleges that he "is employed in the Executive branch and reports directly to an Inspector General." ECF No. 1 ¶ 5. Between 2021 and 2023, the Integrity Committee reviewed at least five allegations of misconduct against him. *Id.* ¶¶ 40–51. Two of those matters were closed without an investigation following Read's responses to the allegations. *Id.* ¶¶ 43, 45. But at least one resulted in a more formal inquiry in which the Integrity Committee interviewed him and obtained records that included his personally identifiable information. *Id.* ¶¶ 40–41. And for the other two, Read alleges that the Integrity Committee voted to refer them to the Inspector General to whom he reports for further action. *Id.* ¶ 50.

Read sued in June 2024. ECF No. 1. He named as Defendants CIGIE, its Executive Chairperson and Chairperson, the Integrity Committee, and Kimberly Howell, the Chairperson of the Integrity Committee, who was the Inspector General for the Corporation for Public Broadcasting. ECF No. 1 ¶ 10. Read brings six claims. Claims One through Four allege that CIGIE and the Integrity Committee violated FACA—the Federal Advisory Committee Act—by failing to allow him to attend Integrity Committee meetings and to inspect CIGIE records concerning those meetings. *See id.* ¶¶ 52–56, 69–74. Read also alleges that these violations were arbitrary and capricious agency action and constitute a pattern or practice of violating FACA. *Id.* ¶¶ 69–74.

Claim Five alleges that by investigating allegations of misconduct against him, Howell unconstitutionally wielded Executive Branch power against Read through her role as Chairperson of the Integrity Committee. ECF No. 1 ¶¶ 75–83. Read alleges that Howell was a private citizen at the time. *Id.* ¶¶ 81–82. Thus, he says, because Howell has allegedly "never been appointed in the Executive Branch" and "[n]o one in the Executive Branch supervises" her, she may not constitutionally exercise the power of Chairperson of the Integrity Committee. *Id.* ¶¶ 78–80. Finally,

in Claim Six, Read alleges that Defendants violated the Privacy Act, 5 U.S.C. § 552a, by disclosing personally identifiable records to Howell because she is purportedly only a private citizen. ECF No. 1 ¶¶ 84–90.

Defendants move to dismiss. ECF No. 9. They begin by asking the Court to dismiss Claim Five under Federal Rule of Civil Procedure 12(b)(1) because Read purportedly lacks standing to bring this claim and because it is unripe. ECF No. 9-1 at 17–18. In the alternative, they argue that Claim Five fails to state a claim and should be dismissed under Rule 12(b)(6). *Id.* at 18–21. Next, they ask the Court to dismiss Claims One through Four for failure to state a claim because neither CIGIE nor the Integrity Committee is subject to FACA. *Id.* at 21–25. Finally, they move to dismiss Claim Six for failure to state a claim because, they argue, the Privacy Act permitted Defendants to share Read's personally identifiable information with Howell. *Id.* at 25–27. Read opposes and, following Defendants' reply, moved to file a sur-reply and later also moved to file additional material in the record. ECF Nos. 11, 13, 21.

In October 2024, while the motion to dismiss was pending, Read told the Court that the Integrity Committee had concluded its three remaining open matters relating to him. *See* ECF No. 15. Defendants responded, arguing that this development meant that Read's Fifth Claim was moot. ECF No. 16. Then, in August 2025, Defendants told the Court that Howell's term as Chairperson of the Integrity Committee had ended. ECF No. 22 at 2. The Court then requested supplemental submissions addressing whether Claim Five was moot. Minute Order of Sept. 8, 2025; *see* ECF Nos. 24, 26.

## II. Legal Standards

"Federal [district] courts are courts of limited jurisdiction," possessing "only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). The court has the

"affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). This "includes the obligation to consider the possibility of mootness." *Holland v. ACL Transp. Servs., LLC*, 815 F. Supp. 2d 46, 52 (D.D.C. 2011). In evaluating a motion to dismiss for lack of jurisdiction under Rule 12(b)(1), a court must "assume the truth of all material factual allegations in the complaint" while also "granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quotation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III. Analysis

### A. Read's Constitutional Claim is Moot (Claim Five)

The Court begins with Claim Five, the sole claim for which Defendants have asserted a jurisdictional defense. In this claim, Read alleges that Howell, purportedly a private citizen because of the status of the Corporation for Public Broadcasting, unconstitutionally assumed executive power by acting as a member and Chairperson of the Integrity Committee. ECF No. 1 ¶¶ 75–83. Defendants, for their part, argue that Read lacks standing and that his claim is moot, largely

because of developments since this suit was filed. ECF No. 28 at 7–8. Because the Court agrees that these developments have rendered Claim Five moot, it will grant Defendants' motion to dismiss Claim Five.

"Article III, Section 2 of the Constitution permits federal courts to adjudicate only actual, ongoing controversies." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL-CIO*, 721 F.3d 678, 687 (D.C. Cir. 2013) (quoting *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Ords. of Jud. Conf. of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001)). "A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up). "To save a case from mootness the ongoing injury must be more than a remote possibility, not conjectural, and more than speculative." *Liu v. Immigr. & Naturalization Serv.*, 274 F.3d 533, 535 (D.C. Cir. 2001) (citation modified). "If events outrun the controversy such that the court can grant no meaningful relief, the case must be dismissed as moot." *McBryde*, 264 F.3d at 55.

To repeat, Claim Five alleges that Howell unconstitutionally wielded Executive Branch power against Read in her role as Chairperson of the Integrity Committee by investigating allegations of misconduct against him. *See* ECF No. 11 at 9. More specifically, Read says that, from 2021–23, the Integrity Committee looked into several allegations of misconduct against him, and in doing so, it asked him for written responses, reviewed relevant documents with his personal information, and interviewed him. ECF No. 1 ¶¶ 41–47. Read asserts that his injury was being "subjected to 'an illegitimate proceeding, led by an illegitimate decisionmaker.'" ECF No. 11 at 9 (quoting *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023)); *see also* ECF No. 1 ¶ 67 ("[Read]

has been and is being subjected to an unconstitutional assertion of Executive branch power."). As the only form of remedy requested for this injury, Read requests in the Complaint that the Court enjoin Howell from "exercising any power of" the Executive Branch. ECF No. 1 at 22.

But recall that, while Defendants' motion was pending, the Integrity Committee concluded its activities on all three of its open matters relating to Read. Read told the Court that Howell had sent a letter to then-President Biden which "describe[d] alleged administrative misconduct on the part of [Read], attache[d] supporting evidence, and indicate[d] that the Integrity Committee [had] 'close[d]' the matter and 'refer[red]' it to the President 'for any action [he] deem[ed] necessary.'" *See* ECF No. 15 at 1. And after that, Howell's term as Integrity Committee Chairperson ended. ECF Nos. 15, 22.

Read notified the Court of the Integrity Committee's letter on October 6, 2024, and provided a link to the letter as uploaded to the webpage of the U.S. House Committee on Oversight and Government Reform's Minority. ECF No. 15 at 2 n.1. While the link Read provided is no longer operable, another copy of the letter, matching all relevant details the parties supplied, appears elsewhere. *See Integrity Committee Letter to the White House Regarding DHS IG Cuffari Dated October 2, 2024* ("*Integrity Committee Letter*"), DocumentCloud (Oct. 8, 2024), https://www.documentcloud.org/documents/25183491-integrity-committee-letter-to-the-white-house-regarding-dhs-ig-cuffari-dated-october-2-2024/ (noting that the document was uploaded by a reporter at the government watchdog group Project on Government Oversight). The letter conveyed to President Biden the "findings, conclusions and recommendations of the Integrity Committee . . . regarding eight multi-part allegations of misconduct" pertaining to several named subjects, none of whom was Read. *See id.* at 1.

In fact, the letter did not mention Read by name or even describe the nature of the

misconduct allegations against him. The letter referred to the Integrity Committee's three open matters that relate to Read under a heading titled "Related Attached IC Matters." *Integrity Committee Letter* at 20–21. And it informed President Biden of these three "additional allegations of wrongdoing" that it "voted to close." *Id.* at 21. According to the letter, the Integrity Committee "ha[d] not investigated" or "made findings or conclusions regarding" these matters. *Id.* at 20. Instead, it "referr[ed] them to [then-President Biden] for [his] awareness and any action [he] deem[ed] appropriate." *See id.* at 20; ECF No. 15. Since then, no disciplinary or other adverse action has been taken or threatened against Read because of the letter or the misconduct allegations.

Because the Integrity Committee has long since concluded all its open matters relating to Read, and there are no grounds to believe it will take any further action relating to him, he has no "ongoing injury" from activity by the Integrity Committee that is "more than a remote possibility, not conjectural, [and] more than speculative," and thus Claim Five is moot. *Liu*, 274 F.3d at 535. As alleged in the Complaint and affirmed in his supplemental submission, Read's only asserted injury linked to Claim Five was being investigated by a supposedly illegitimate body, the Integrity Committee, as chaired by Howell. *See* ECF No. 1 ¶ 67 ("[Read] has been and is being subjected to an unconstitutional assertion of Executive branch power [by Howell]."); ECF No. 24 at 4 ("[Read's] injury was being subjected to an unconstitutional process."). And the only relief he requests with respect to Claim Five is an injunction of Howell's allegedly unconstitutional exercise of investigatory power. But Howell is no longer in charge of the Integrity Committee, and whatever informal inquiry it conducted into these matters—in the letter, it disclaimed conducting an "investigation"—has been over for two years. So there is no non-speculative and non-conjectural additional activity on the part of the Integrity Committee that could injure Read, and no such

activity the Court could enjoin.

Still, Read tries to hold open the possibility that he may suffer a future injury due to the Integrity Committee's activity under Howell. *See* ECF No. 24 at 4 (stating that the letter is "like the sword of Damocles hanging over" him); ECF No. 9 at 2 (describing the letter as "adverse"). But similarly, there is no non-speculative and non-conjectural basis to believe that Read will suffer any disciplinary or other adverse action linked to the Integrity Committee's completed work. To repeat, that activity concluded about two years ago. And on top of that, the Integrity Committee disclaimed making any findings or reaching any conclusions about the allegations of misconduct against Read. Whatever chance exists that Read will suffer a future injury as a result of the Integrity Committee's activity under Howell is, at this point, less than remote. Such speculation is far too slim a reed to suggest that Claim Five is not moot. *See Citizens for Resp. & Ethics in Washington v. Wheeler*, 352 F. Supp. 3d 1, 9 (D.D.C. 2019) (finding mootness when "[t]he Complaint lacks any allegation to support an inference that [the challenged] policy or practice would continue" after the departure of an agency official).

Read also relies on the D.C. Circuit's decision in *McBryde*, 264 F.3d at 56–57, to argue that, because a "historical record" exists of the allegedly-unconstitutional investigation, his claim is not moot. ECF No. 27 at 2. He argues that the Court could still provide him effective injunctive relief, because it could order the Integrity Committee to "retract" the letter or to "issue an amended [letter] that omits reference to matters involving" him. *Id.* But for several reasons, *McBryde* is inapposite. In that case, the plaintiff—a federal district judge—challenged a two-year investigation by a Special Committee of the Judicial Council that had resulted in sanctions and the publication of a 159-page report detailing how he had "engaged for a number of years in a pattern of abusive behavior" *McBryde*, 264 F.3d at 54 (quotation omitted), which created an "oppressive and

intimidating atmosphere" in his courtroom and could be "humiliating" to lawyers appearing before him, *id.* at 71 (Tatel, J., concurring). The Circuit held that, while the judge's claims related to sanctions—which had since lapsed—were moot, claims challenging the report were not moot because its continued public availability caused him ongoing reputational harm. *Id.* at 56–57. In contrast, Read expressly *disclaims* any claim of reputational injury linked to the Integrity Committee's letter. *See* ECF No. 27 at 2. And Read would be hard pressed to make such a claim. The letter does not mention Read or even describe the allegations of misconduct against him. It explains that the Integrity Committee did not investigate the allegations and disclaims any findings or conclusions about them. In contrast to *McBryde*, the only injury claimed by Read in connection with Count Five is the now-past injury of being subjected to Howell's alleged exercise of unconstitutional power. And there is no injunctive relief that the Court could award that would remedy that injury. For that reason, Count Five is moot.

### B. Read's FACA and APA Claims Fail to State a Claim Because CIGIE is Not Subject to FACA (Claims One Through Four)

In Claims One through Four, Read alleges that both CIGIE and its Integrity Committee violated FACA by failing to satisfy the statute's requirements. To state a claim under FACA, a plaintiff must allege facts from which it can be inferred that the entity to which it purportedly applies is an "advisory committee" under the law. 5 U.S.C. § 1001(2); *see Am. Oversight v. Biden*, No. 20-cv-716 (RJL), 2021 WL 4355576, at *7 (D.D.C. Sept. 24, 2021). The Court agrees that neither CIGIE nor the Integrity Committee is an advisory committee, and so he has failed to state a claim.

Congress passed FACA in 1976 "to address problems created by the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise officers and agencies in the executive branch.'" *Sofamor Danek Grp. v. Gaus*, 61 F.3d 929, 932

(D.C. Cir. 1995) (quoting 5 U.S.C. § 1002(a)). "FACA's principal purpose was to enhance the public accountability of advisory committees established by the Executive Branch and to reduce wasteful expenditures on them." *Pub. Citizen v. DOJ*, 491 U.S. 440, 459 (1989). To that end, FACA requires an "advisory committee" to, among other things, hold its meetings open to the public, provide public notice of each meeting, and permit interested members of the public to attend and participate in such meetings. 5 U.S.C. § 1009(a).

FACA defines "advisory committee" as "a committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . that is established or utilized to obtain advice or recommendations for the . . . Federal Government." 5 U.S.C. § 1001(2)(A). Despite the "almost unfettered breadth" of this definition, it does not "cover every formal and informal consultation between the President or an Executive agency and a group rendering advice." *Pub. Citizen*, 491 U.S. at 452–53 & n.8. Rather, it is meant to cover committees whose work is "exclusively advisory in nature." *Id.* at 446. For this reason, the D.C. Circuit has held that an entity is not covered by FACA when it is "operational." *Sofamor Danek Grp.*, 61 F.3d at 935 & n.28. "Operational functions are those specifically provided by law, such as making or implementing Government decisions or policy." *Nat. Res. Def. Council v. EPA*, 806 F. Supp. 275, 276 (D.D.C. 1992) (quotation omitted); *see also* 41 C.F.R. § 102-3.40(j) ("Operational functions are those specifically authorized by statute or Presidential directive, such as making or implementing Government decisions or policy."). Thus, even when an entity has some "advisory functions," it will not fall within the definition of "advisory committee" so long as its functions are "primarily operational." *Pub. Citizen v. Comm'n on Bicentennial of U.S. Const.*, 622 F. Supp. 753, 757 (D.D.C. 1985). In addition, whether an entity is an "advisory committee" turns in part on what *type* of advice it provides. "Congress was concerned with formal committees

organized to make recommendations as to an identified governmental policy." *Jud. Watch, Inc. v. Clinton* ("*Jud. Watch I*"), 880 F. Supp. 1, 8 (D.D.C. 1995), *aff'd by Jud. Watch, Inc. v. Clinton* ("*Jud. Watch II*"), 76 F.3d 1232 (D.C. Cir. 1996). Thus, even when an entity's "primary activity" is to render advice, that entity is still not an advisory committee if "the advice called for is not directed to *governmental policy*." *Jud. Watch II*, 76 F.3d at 1233 (emphasis added).

The Court concludes that CIGIE and the Integrity Committee are primarily operational, taking them out of FACA's ambit. "Operational functions are those specifically provided by law, such as making or implementing Government decisions or policy." *Nat. Res. Def. Council*, 806 F. Supp. at 276 (quotation omitted). Courts have taken a broad view of what it means to be "operational." Committees are "operational" when they "plan and develop activities" and "contract for supplies, services, and property" to fulfil their goals. *Comm'n on Bicentennial of U.S. Const.*, 622 F. Supp. at 757–58. Examples of "operational activities" also include "investigat[ions]," maintaining records, and "monitor[ing] and inspect[ing]" a federal program's participants for compliance with the relevant statutes. *HLI Lordship Indus., Inc. v. Comm. for Purchase from Blind & Other Severely Handicapped*, 615 F. Supp. 970, 978 (E.D. Va. 1985), *rev'd on other grounds*, 791 F.2d 1136 (4th Cir. 1986). So where a committee is told "not only to develop . . . plans, but also to carry them out," that committee is operational, not advisory. *Comm'n on Bicentennial of U.S. Const.*, 622 F. Supp. at 758.

A passing glance at the statute establishing CIGIE and its Integrity Committee shows that both are operational, not advisory. Among other duties, CIGIE must "develop plans for coordinated, Governmentwide activities that address" problems of fraud, waste, and abuse in federal programs and operations, including "audit, investigation, inspection, and evaluation programs and projects." 5 U.S.C. § 424(c)(1)(B). CIGIE must also "maintain an Internet website," "maintain 1

or more academies . . . for the professional training of auditors, investigators, inspectors, evaluators, and other personnel of the various offices of the Inspector General," "make . . . reports to Congress," "receive, review, and mediate any disputes submitted in writing to [CIGIE] by an Office of Inspector General regarding an audit, investigation, inspection, evaluation, or project that involves the jurisdiction of more than one Office of Inspector General," and "perform other duties within the authority and jurisdiction of [CIGIE], as appropriate." *Id.* §§ 424(c)(1)(D)–(E), (G)–(I). CIGIE may also "authorize the use of interagency funding" for, among other things, "Governmentwide training of employees of the Offices of the Inspectors General." *Id.* § 424(c)(3)(A). Finally, CIGIE must "develop best practices for coordination and communication in promoting the timely and appropriate handling and consideration of protected disclosures" made by whistleblowers and "facilitate the work of the Whistleblower Protection Coordinators." *Id.* § 424(c)(5).

Even assuming that CIGIE has some functions that may properly be considered "advisory," its organic statute makes clear that it is required "not only to develop . . . plans, but also to carry them out." *Comm'n on Bicentennial of U.S. Const.*, 622 F. Supp. at 758. And because CIGIE must carry out these "[o]perational functions . . . specifically provided by law," it is not an advisory committee. *Nat. Res. Def. Council*, 806 F. Supp. at 276 (quotation omitted).

The same is true for the Integrity Committee. By statute, the Integrity Committee must "receive, review, and refer for investigation allegations of wrongdoing that are made against Inspectors General and staff members of the various Offices of Inspector General." 5 U.S.C. § 424(d)(1). When an investigation is referred to the Integrity Committee for review, the Integrity Committee must "determine whether to refer the allegation of wrongdoing to the Chairperson of the Integrity Committee to initiate an investigation." *Id.* § 424(d)(5)(B)(i). The Chairperson then must "cause a thorough and timely investigation of each allegation referred . . . to be conducted."

*Id.* § 424(d)(6)(A). And these investigations must follow "policies and procedures necessary to ensure fairness and consistency" that the Integrity Committee is tasked with "establish[ing]." *Id.* § 424(d)(7)(B)(i). Finally, at the end of an investigation, the Chairperson must send a report to the full Integrity Committee, which then must "assess the report" and issue recommendations "to the Executive Chairperson of the Council and to the President . . . or the head of a designated Federal entity . . . for resolution," as appropriate. *Id.* §§ 424(d)(7)(E)(i), (8)(A)(i)–(ii).

These functions are operational, not advisory. Again, entities that conduct investigations or that otherwise "monitor[] and inspect[]" compliance with federal law are "primarily operational in function and, therefore, do[] not fall within the purview of" FACA. *HLI Lordship Indus., Inc.*, 615 F. Supp. at 978–79. That the Integrity Committee ultimately issues "recommendations" based on the results of its investigations does not change that result. *See id.* at 978. Where a committee's recommendations stem from its prior investigations and evaluations, "its advisory capacity is secondary to its operational activities." *Id.*

Even if these recommendations could be considered advisory in a colloquial sense, they are not advisory as that word is understood in the FACA context. Again, to be "advisory" under FACA, the advice must be "directed to *governmental policy*." *Jud. Watch II*, 76 F.3d at 1233 (emphasis added). But the recommendations issued by the Integrity Committee—such as recommendations about disciplinary action—are not. "Policy" involves a "standard course of action that has been officially established by an organization, business, political party, etc." *Policy*, *Black's Law Dictionary* (12 ed. 2024). But the Integrity Committee's recommendations involve no generally appliable rules or standards and instead address a proposed disposition for a specific investigation. They thus address no "identifiable . . . policy," "national" or otherwise. *Nader v. Baroody*, 396 F. Supp. 1231, 1234 (D.D.C. 1975).

### C. Read's Privacy Act Claim Fails to State a Claim (Claim Six)

Read alleges in Claim Six that Defendants violated the Privacy Act in disclosing "records pertaining to him" to Howell. ECF No. 1 ¶¶ 84–90. "To state a claim under the Privacy Act, a plaintiff must establish that (1) the agency violated a provision of the Act; (2) the violation was intentional or willful; and (3) the violation had an 'adverse effect' on the plaintiff in the form of actual damages." *Chichakli v. Tillerson*, 882 F.3d 229, 233 (D.C. Cir. 2018) (quoting *Maydak v. United States*, 630 F.3d 166, 178 (D.C. Cir. 2010)). Read has failed to allege that Defendants violated the Privacy Act here, so he has failed to state a claim.

The Privacy Act prohibits agencies from disclosing "any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains," unless one of thirteen statutory exceptions applies. 5 U.S.C. § 552a(b). One such exception applies when an agency discloses records under a "routine use." *Id.* § 552a(b)(3). The Privacy Act defines a "routine use" as, "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). And it also provides that, to claim the exception, the agency must have published a notice in the Federal Register listing that use as routine. *Id.* § 552a(e)(4)(D). So "[t]o fit within the confines of the routine use exception to the Privacy Act, an agency's disclosure of a record must be both (i) 'for a purpose which is compatible with the purpose for which it was collected' and (ii) within the scope of a routine use notice published by the agency." *Ames v. DHS*, 861 F.3d 238, 240 (D.C. Cir. 2017) (quoting 5 U.S.C. § 552a(a)(7)).

Both prongs are met here. As to the first, Defendants argue that "CIGIE's purpose in collecting any records related to [Read] was necessarily to investigate allegations or complaints received concerning misconduct by" him. ECF No. 9-1 at 26–27. And they say that their disclosure of those records to Howell was "to conduct an investigation of wrongdoing, which courts have

repeatedly held is a compatible purpose." *Id.* (collecting cases). As to the second prong, Defendants point out that CIGIE's notice in the Federal Register lists as a routine use disclosure of records "[t]o officials of CIGIE and the Integrity Committee, as well as CIGIE and Integrity Committee members and their staff members, who have need of the information in the performance of their duties." Privacy Act of 1974; System of Records, 87 Fed. Reg. 55795-02, 55797 (Sept. 12, 2022). They also point out that Howell was such an individual and needed the information to perform her official duties. *See* ECF No. 9-1 at 27.

Read does not respond by directly addressing these arguments. But he argues that the Privacy Act and 5 U.S.C. § 424, "read together or separately, cannot be interpreted to give the CIGIE Chairperson the authority to confer on a private citizen such as Defendant Howell a privilege that no other private citizen has, namely, access to sensitive information about an individual's alleged 'wrongdoing' maintained in government files." ECF No. 11 at 24. But he provides no authority supporting his position—and the Court can find none. In fact, the Privacy Act permits agencies to disclose records as part of a routine use, *including to private citizens*, as Read would characterize Howell. 5 U.S.C. § 552a(b)(3). The Privacy Act tells agencies what they must do to assert that exception. *Id.* And Defendants have shown that they complied with those requirements, which Read does not contest. In the end, Read has identified nothing in either the Privacy Act or 5 U.S.C. § 424 that forbids Defendants from disclosing records in a way that the Privacy Act expressly permits.

Read also fails to state a Privacy Act claim for another reason: he has not alleged facts from which it can be inferred that he suffered an "adverse effect . . . in the form of actual damages" flowing from a violation of the statute. *Chichakli*, 882 F.3d at 233 (D.C. Cir. 2018). Such damages, the Supreme Court has held, are the equivalent of "special damages" which are limited to

"pecuniary loss," do not include "the loss of reputation, shame mortification, injury to the feelings and the like," and must be "specially pleaded and proved." *FAA v. Cooper*, 566 U.S. 284, 295–296 (2012). Read's Complaint does not provide the Court with any foothold to make such an inference. For all these reasons, Read has failed to allege a Privacy Act violation.[1]

## IV. Conclusion

For all the above reasons, the Court will grant Defendants' motion and dismiss the case. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 28, 2026

[1] The Court will grant Read's motion for leave to file a surreply, ECF No. 13, as the "decision to grant or deny leave to file a surreply is committed to the sound discretion of the court." *Schmidt v. Shah*, 696 F. Supp. 2d 44, 59 (D.D.C. 2010). It will also grant his motion for leave to file documents reflecting a change to the bylaws of the Corporation for Public Broadcasting. ECF No. 21. Still, neither of these submissions impacts the Court's basis for dismissing the case.